UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS BUSH,

      Plaintiff,

v.

ANDREW SAUL, COMMISSIONER
OF SOCIAL SECURITY,

      Defendant.

Case No. 2:20-cv-11893
District Judge Stephen J. Murphy, III
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDTION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.     Introduction

This is a social security case.  Plaintiff Thomas Bush brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 13, 15), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Bush is not disabled under the

1

Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 15) be GRANTED, Bush's Motion for Summary Judgment (ECF No. 13) be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.      Background

### A.      Procedural History

Bush was born on March 10, 1958, making him 59 years old at the time of his alleged onset date (AOD) of March 9, 2018.  (ECF No. 11, PageID.223).  He had previously filed a claim with an AOD of May 8, 2013, that was denied on March 8, 2018, the day prior to this claim's AOD.  (*Id.*, PageID.101-114).  In his current, and second, application, he has alleged a worsening condition based on new and material evidence.  (*Id.*, PageID.286-287).

Bush has a high school education and prior work experience as an estimator and HVAC technician.  (*Id.*, PageID.238).  He alleged disability due to a left torn rotator cuff, bilateral knees, and diabetes.  (*Id.*, PageID.237).

After Bush's DIB application was denied at the initial level on November 5, 2018, (*Id.*, PageID.133), he timely requested an administrative hearing, which was held on August 1, 2019, before the ALJ.  (*Id.*, PageID.59-97).  Bush testified at the hearing, as did a vocational expert (VE).  (*Id.*).  His testimony will be discussed in

2

the following section.  On August 28, 2019, the ALJ issued a written decision

finding that Bush was not disabled from his alleged onset date to March 31, 2019,

his date last insured.  (*Id*., PageID.47-55).  On May 28, 2020, the Appeals Council

denied review, making the ALJ's decision the final decision of the Commissioner.

(*Id*., PageID.33-35).  Bush timely filed for judicial review of the final decision.

(ECF No. 1).

## B.     Medical Evidence

Though medical evidence from prior to 2017 was not included in the

transcript, the ALJ's decision from Bush's first application noted that Bush

underwent an "uncomplicated surgical left shoulder open acromioplasty with

rotator cuff reconstruction" in December 2009.  (ECF No. 11, PageID.107).

Following this, Bush had normal post-surgery imaging and showed strength

deficits but had intact neurovascular function.  (*Id*.).  He returned to work with

some restrictions that were eventually lessened, restricting him to lifting twenty to

twenty-five pounds and no lifting over the shoulder with his left hand.  (*Id*.).

In May 2013, Bush underwent a "left knee arthroscopy, meniscectomy, and

chondroplasty, which follow up showed had improved," though Bush alleged the

onset of disability on the date of this surgery.  (*Id*.).  Post-surgery, Bush reported

feeling better, getting stronger, and being able to increase activities including bike

3

riding and fishing on his boat.  (*Id*.).  He was able to perform deep knee bending

and squatting as well.  (*Id*.).

In February 2014, bilateral knee imaging revealed a right knee meniscus tear

and degenerative joint disease of both knees.  (*Id*., PageID.108).  Bush then

underwent a right knee arthroscopy and chondroplasty, following which he was

doing well, treated his pain with Norco, and did not require an assistive device for

ambulation.  (*Id*.).  He reported pain in August 2014, but his condition remained

stable at that visit and during follow up examinations in November 2015, March

2017, and October 2017.  (*Id*., PageID.108-109).

As for the medical records considered by this ALJ, Bush was treated in

December 2017 by an orthopedic specialist, with imaging revealing moderate

degenerative changes of the medial compartment in the right knee and moderate to

severe degenerate change in medial compartment of the left knee.  (*Id*.,

PageID.314).  Bush reported knee pain rating at eight out of ten, but was in no

acute distress and had done well with injections in the past.  (*Id*.).  The record

reflects that he underwent injections in September 2017, and again in December

2017, March 2018, June 2018, and September 2018.  (*Id*., PageID.314, 317, 319,

367-368).

4

Bush was also treated at Brooklyn Family Practice from July 2017 to April 2019, for diabetes, hypertensive disorder, hyperlipidemia, obesity, chronic obstructive pulmonary disease, and pain in the knees, arms and shoulders resulting in decreased range of motion. (*Id.*, PageID.325, 328-329, 332, 335-336, 357, 360-361, 363). These records also reflect normal respiratory and cardiovascular exams, and consistent treatment with pain medication, knee injections, and a left knee brace. (*Id.*).

In August 2018, Bush underwent right knee imaging that reflected moderate-to-severe degenerative joint changes in the medial compartment, which had "progressed slightly" from his condition at the time of the previous imaging in December 2017. (*Id.*, PageID.373). He also had moderate degenerative joint changes of the patellofemoral compartment, which had progressed as well. (*Id.*). In September 2018, Bush was seen by an independent medical examiner, Clifford M. Buchman, D.O. (*Id.*, PageID.376-379). Bush stated that he had returned to work after his shoulder surgery, but that "[a]fter two years there was no work available." (*Id.*, PageID.376). He complained of bilateral knee pain and left shoulder pain, but was able to drive, shower, and dress independently, as well as do "some housework." (*Id.*, PageID.377).

5

At the hearing, Bush testified that he took 7.5 milligrams of Norco three times per day, as well as taking Motrin as needed, for pain.  (*Id.*, PageID.74).  He further stated that he could walk "[m]aybe 100 yards" before needing a break, could stand for ten minutes and sit for twenty minutes before needing to change positions, and could lift a gallon of milk with his right arm but not with the left. (*Id.*, PageID.77-78).  He admitted no difficulty grooming or taking care of himself, but does "not many" chores, including letting the cats outside and helping with dinner.  (*Id.*, PageID.78).  He does "very little" dishes and laundry, no yard work, and goes to the grocery store with his wife, but does not do any of the shopping himself.  (*Id.*).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

6

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

7

Following this five-step sequential analysis, the ALJ found that Bush was not disabled under the Act.  At Step One, the ALJ found that Bush had not engaged in substantial gainful activity since his alleged onset date.  (ECF No. 11, PageID.50).  At Step Two, the ALJ found that he had the severe impairments of degenerative joint disease of the bilateral knees; history of a torn left rotator cuff status-post surgical repair; and obesity.  (*Id*.)  At Step Three, the ALJ found that Bush's impairments, whether considered alone or in combination did not meet or medically equal a listed impairment.  (*Id*., PageID.52).

The ALJ then assessed Bush's residual functional capacity (RFC), concluding that he was capable of performing light work with the following additional limitations:

> With his right upper extremity, [Bush] can lift, carry, push or pull 20 pounds occasionally and ten pounds frequently.  With his left upper extremity, he is limited to lifting and carrying no more than 10 pounds, pushing no more than 15 pounds, and pulling no more than 10 pounds. He can sit for six hours in an eight-hour workday, and can stand or walk for four hours in an eight-hour workday.  He must change positions every 20 to 30 minutes for three to five minutes at a time.  He can never reach overhead with his left upper extremity; he can frequently reach below head level with his left upper extremity.  He has no limitation on reaching his right upper extremity.  He can never climb ladders, ropes or scaffolds; he can occasionally climb ramps or stairs.   He can occasionally balance, kneel, crouch and crawl, and he can frequently stoop.  He is limited to occasional exposure to extreme cold. He must avoid all exposure to unprotected heights and moving mechanical parts.

(*Id*.).

8

At Step Four, the ALJ found that Bush was able to perform his past relevant work as an estimator, based in part on testimony provided by the VE in response to hypothetical questions.  (*Id*., PageID.54-55).  As a result, the ALJ concluded that Bush was not disabled under the Act.  (*Id*., PageID.55).

IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence

9

> to support the agency's factual determinations. And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high. Substantial evidence, this Court has
> said, is more than a mere scintilla. It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the
judiciary's ability to review decisions by administrative agencies, but it does not
grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc.
Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard ...
presupposes that there is a zone of choice within which the decisionmakers can go
either way, without interference by the courts.") (quoting *Blakley v. Comm'r of
Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)). An ALJ's factual findings are
therefore subject to multi-tiered review, but those findings are conclusive unless
the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The
Court must " 'take into account whatever in the record fairly detracts from [the]
weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395
(6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487
(1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this
Court defers to that finding even if there is substantial evidence in the record that

10

would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (internal quotations omitted).

## V.    Analysis

Bush challenges the ALJ's subjective symptom analysis, the treatment of the treating source medical opinion from Michael J. Lyons, PA-C, and the conclusion that Bush can return to the past relevant work of estimator.  The Commissioner responds that the ALJ properly relied on the prior ALJ's decision in evaluating the medical evidence to that point, the ALJ's decision was supported by substantial evidence in his own analysis, and Bush has not met his burden to upset the ALJ's Step Four conclusion regarding past relevant work.

### A.

The ALJ considered Bush's testimony that his condition had worsened since his last Social Security disability hearing and that he could walk 100 yards, stand for ten minutes at a time, sit for twenty minutes at a time, and lift a gallon of milk, though not with his left arm.  (ECF No. 11, PageID.53, 77-78).  Bush also testified

that he had no problems with grooming, cooked occasionally, did very little dishes and laundry, and went grocery shopping, though he just went "to walk around a little bit." (*Id*., PageID.53, 78-79). Bush further testified that the condition of his left shoulder had deteriorated and was "a lot worse," according to the last doctor he had seen. (*Id*., PageID.74).

The ALJ stated that he found the allegations "generally consistent with the medical evidence," though he disagreed that any progression in Bush's condition was severe enough to result in an alteration of the prior RFC, and assessed an RFC which was identical to the one used by the ALJ in his prior application. (*Id*., PageID.52-54). Bush argues that in doing so, the ALJ improperly evaluated the intensity, persistence, and limiting effects of his subjective physical symptoms.

The Social Security Regulations establish a two-step process for evaluating a claimant's subjective symptoms, including pain. 20 C.F.R. § 404.1529(a); SSR 16-3p. According to Social Security Ruling ("SSR") 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it – formerly termed a "credibility" determination – can be disturbed only for a

"compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' ... to 'clarify the subjective symptoms evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged pain, considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6) any means used to relieve pain; and (7) other factors concerning functional limitations. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

Bush argues that the ALJ found that "most records show that the claimant's pain is reasonably controlled" without providing support for this claim. *See* ECF No. 11, PageID.53. But Bush fails to "read the ALJ's decision as a whole." *Koch v. Comm'r of Soc. Sec. Admin.*, No. 5:19-CV-13631, 2021 WL 1565422, at *5 (E.D. Mich. Feb. 11, 2021), *report and recommendation adopted sub nom. Koch v. Comm'r of Soc. Sec.*, 2021 WL 1186502 (E.D. Mich. Mar. 30, 2021) (citing *Athey*

13

*v. Comm'r of Soc. Sec.*, No. 13-cv-12528, 2014 WL 4537317, at *4 (E.D. Mich. Sept. 11, 2014); *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole ... it would be a needless formality to have the ALJ repeat substantially similar factual analyses" in different parts of the decision.)).  Further, Bush does not address the persuasive effect of the prior ALJ's decision, which was "taken into legitimate consideration" by the current ALJ.  (*Id.*, PageID.47).

Since Bush's current application under review was a subsequent application seeking benefits for a distinct period of time, this application is "entitled to [its own] review" and *res judicata* does not apply to bind the current ALJ.  *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018). But this " '[f]resh review is not blind review' "; therefore, the ALJ considering a subsequent application "can properly consider a previous ALJ's RFC assessment and errs only when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019) (quoting *Earley*, 893 F.3d at 934).

Recognizing the preclusive effect of the prior decision, Bush filed a new disability claim with an alleged onset date of March 9, 2018, the date following the previous ALJ's decision.  *See* ECF No. 11, PageID.101-114.  "Generally, the ALJ

14

only considers evidence from the alleged disability onset date through the date last insured." *Coleman v. Comm'r of Soc. Sec.*, No. 12-CV-10809, 2013 WL 1316953, at *3 (E.D. Mich. Mar. 29, 2013) (internal quotations omitted).  Evidence from prior to the onset date should be considered to the extent it is relevant, but its weight can properly be limited to the purpose of providing a foundation for consideration of the claimant's current disability status.  *Id*. (citations omitted).

Based on this framework, the ALJ cited medical records prior to the alleged onset date to "establish that the claimant had degenerative joint disease of the bilateral knees; history of a torn left rotator cuff status-post surgical repair; and obesity." (ECF No. 11, PageID.54 (citing PageID.309-316)).  However, as the ALJ noted, a comparison of those medical records to ones post-dating the alleged onset date reflect no substantial change in Bush's condition.  Records from September and December of 2017 reflect pain levels of 7/10 and 8/10, respectively, with no acute distress, no laxity to varus and valgus stress, negative Lachman and negative posterior drawer tests, and no evidence of obvious effusion. (*Id*., PageID.312, 314).  On March 12, 2018, Bush was assessed with the same results, and rated his pain at a 7/10.  (*Id*., PageID.317).  In June 2018, the same results were assessed once again, though he did report increased right knee pain, which ultimately necessitated an updated x-ray in August 2018.  (*Id*., PageID.319).

15

That x-ray, which the ALJ cited as the "sole finding for a worsening in claimant's condition," showed moderate-to-severe degenerative joint changes of the medial compartment, which the findings indicate have "progressed slightly since the previous x-ray" in December 2017.  (*Id*., PageID.54, 373).

Bush cites to other medical records in an attempt to demonstrate a worsening condition, but these are for the most part unpersuasive.  In support of a more restrictive RFC in handling and fingering, Bush cites ECF No. 11, PageID.357, 360-361, 363, 369, 378.  The first four of those pages refer to records from April and July of 2017, which predates the alleged onset date in this matter.  Of the two remaining, one reflects decreased left grip strength, but not due to his shoulder condition as Bush implies; rather, this was the result of a "recent injury" on July 20, 2018, which could have been a fracture but was most likely a sprain.  (*Id*., PageID.369).  The other, from September 2018, was an evaluation from Clifford M. Buchman, D.O., who found decreased strength of the left shoulder, tenderness to palpation, and positive impingement, Speed's,[1] and Yergason's[2] tests on the left.

---

[1] The Speed's Test is used to test for superior labral tears or bicipital tendonitis.  It is often combined with the Yergason's test for bicipital tendonitis. https://www.physio-pedia.com/Speeds_Test (last accessed June 22, 2021).
[2] "The Yergason's Test is used to test for biceps tendon pathology, such as bicipital tendonitis and an unstable superior labral anterior posterior (SLAP) lesion." https://www.physio-pedia.com/Speeds_Test (last accessed June 22, 2021).

16

(*Id.*, PageID.378-379).  Dr. Buchman concluded that Bush could not return to his past work as a pipe fitter.  (*Id.*).  The ALJ considered this opinion and found it persuasive, declaring that "[t]he record absolutely shows that the claimant would not be capable of working as a pipe fitter."  (*Id.*, PageID.53).  The ALJ also noted that Bush told Dr. Buchman that he is able to drive, shower, and dress independently, and can do some housework as well.  (*Id.*, PageID.54, 377).

Regarding his right knee, Bush cites to records from August, October, and December 2018, as well as March 2019, but these contain essentially the same findings as the records previously analyzed, reflecting no acute distress, no obvious effusion, knees being stable, sensation intact distally, no laxity to varus and valgus stress, and negative Lachman and negative posterior drawer tests.  (*Id.*, PageID.371, 397, 410-411).  Further, his treatment is unaltered throughout, maintaining his medications and prescribing injections every three months.  (*Id.*). As the Commissioner notes, this is generally considered to be a conservative treatment regimen.  *See Byberg v. Comm'r of Soc. Sec.*, No. 12-10158, 2013 WL 1278397, at *9 (E.D. Mich. Mar. 11, 2013) (noting that "records show very conservative routine treatment, including occasional injections, mild pain medication, and use of a TENS unit."), *report and recommendation adopted*, 2013 WL 1278500 (E.D. Mich. Mar. 27, 2013).  Medications, treatment, and other

methods of pain relief can all be considered by the ALJ in a subjective symptom evaluation.  *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(vi) (directing the ALJ to consider types and effectiveness of treatment in assessing subjective symptoms); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) ("Dr. Kleykamp's modest treatment regimen for Myatt is inconsistent with a diagnosis of total disability.").

The ALJ also relied upon the state agency medical opinions of Larry Jackson, M.D., and Louis Chelton, M.D., from November 2018.  (ECF No. 11, PageID.54).  Dr. Jackson found that Bush's subjective symptoms were only partially consistent with the evidence, noting that the objective evidence was "similar to that used for previous ALJ denial with no change in solid confirmed evidence of worsening of joints or function."  (*Id.*, PageID.128).  Dr. Chelton reviewed Dr. Jackson's opinion and found it to reasonably address the subjective symptoms, and that the evidence supports the RFC suggested by Dr. Jackson.  (*Id.*, PageID.374).  Dr. Chelton's only suggestion was to clarify the sit/stand option, allowing for alternating five minutes of standing after every twenty-five minutes of sitting, which the ALJ found "does not generally differ from previous residual functional capacity."  (*Id.*, PageID.54, 374).  The ALJ found these opinions persuasive, and Bush did not challenge or reference them.

Relatedly, the ALJ found the September 2018 opinion of Michael J. Lyons, PA-C[3] unpersuasive, which Bush challenges within his challenge of the subjective symptom evaluation. (*Id.*, PageID.54). The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the most important factors and the ALJ must explain how she considered these factors in her decision. 20 C.F.R. § 404.1520c(b)(2).

Mr. Lyons' opinion was a form with numbers to circle and boxes to check to indicate Bush's level of limitations. (ECF No. 11, PageID.365-366). The form provided one area to add "additional remarks," but this was left blank by Mr. Lyons, and no support for any of the suggested limitations was provided elsewhere. (*Id.*). Such opinions constitute "weak evidence at best." *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). "Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may

---

[3] A PA-C, or certified physician's assistant, is an acceptable medical source under 20 C.F.R. § 404.1502(a)(8).

19

properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings....' " *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) (quoting *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011)); *see also Smith v. Comm'r of Soc. Sec.*, No. 13-12759, 2015 WL 899207, at *15 (E.D. Mich. Mar. 3, 2015) (citing cases); *Ashley v. Comm'r of Soc. Sec.*, No. 1:12–cv–1287, 2014 WL 1052357, at *8 n. 6 (W.D. Mich. Mar. 19, 2014) (citing cases).

The ALJ found Mr. Lyons' opinion to be inconsistent with the record, which as summarized above indicated continual conservative treatment of Bush's symptoms. (ECF No. 11, PageID.54). It was, in fact, Mr. Lyons who indicated that Bush's condition between his December 2017 and August 2018 x-rays had only "progressed slightly." (*Id.*, PageID.373). The ALJ also stated that the opinion had "no supportive findings to allow for" the suggested limitation on handling and fingering. (*Id.*, PageID.54). As the Commissioner notes, supportability requires objective evidence and supporting explanations "presented by a medical source." 20 C.F.R. § 404.1520c(c)(1). Thus, the subjective reports of increased pain, as cited by Bush, cannot alone not provide sufficient support for the opinion.

20

Bush is not entirely without evidence to support his claim that his condition has worsened since the prior ALJ's decision and may be disabling. His x-rays do portray a slightly deteriorating condition, which is supported by his reports of increased pain and the opinion of a treating source, Mr. Lyons. It is unlikely that this alone could constitute substantial evidence in favor of a disability finding, but even if it could, Bush has failed to show that the ALJ's decision was *not* supported by substantial evidence, which is the key inquiry. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted). Thus, the undersigned recommends affirming the ALJ's subjective symptom evaluation and the weight afforded to the opinion of Mr. Lyons.

### B.

Bush also challenges the ALJ's conclusion that he could return to the past relevant work of an estimator. Bush notes that while an estimator is a sedentary position under the Dictionary of Occupational Titles (DOT), Bush was given an RFC of light work with the restriction that he must be allowed to change positions every twenty to thirty minutes, for three to five minutes at a time. (ECF No. 11, PageID.52). Bush believes this to be contrary to the estimator position.

At the hearing, the VE testified that the so-called sit-stand option is not included in the DOT, but nevertheless would not affect Bush's ability to work as

21

an estimator.  (ECF No. 11, PageID.86).  Bush's counsel cross-examined the VE,

asking what parts of the estimator position could be performed while standing.

(*Id*., PageID.87).  The VE responded that "a sit-stand option is not going to

preclude them from being able to do the things that make that work sedentary

which is primarily the paperwork associate[d] with the job."  (*Id*.).  Counsel

continued to question the VE:

> Q      Okay. So, how would they be analyzing the paperwork if they're
>
> standing up?
>
> A      Well, it's not even -- well, they can hold them in their hands, but
>
> nowadays having a lift on a desk is not even considered to be an
>
> accommodation.  They run anywhere from about $75.00 to upwards of that,
>
> but almost all jobs that are sedentary allow for an option of having that sit
>
> stand type desk.
>
> Q      Have you visited jobs in this capacity, say, where an estimator would
>
> work?
>
> A      I have.
>
> Q      And in this job setting, do the employers then provide desks
>
> that will raise or lower?
>
> A      On a regular basis, ergonomic type things like that are

typically standard in sedentary employment.

(*Id*., PageID.87-88).  The VE continued, testifying that while the device in question

would not be required to be provided to the employee outside of a reasonable

accommodation for a disability, the estimator job does allow for a sit-stand option.

(*Id*., PageID.89-90).  The VE also testified that estimators may be able to do their

job while standing by holding their documents while analyzing them, or if they

preferred to do mathematical computations in their head rather than using pencil

and paper.  (*Id*., PageID.90-91).

In particular, Bush takes issue with the VE's statements that "I've seen

people stack books so that they have a surface that's tall enough for them to write

at in order to do a sit-stand option.  So does an employer have to provide it?  The

answer is no.  Can a person provide one on their own?  The answer is probably yes.

And I don't think any employer has ever denied somebody that I'm aware of the

ability to do this." (*Id*., PageID.94-95).  The Commissioner emphasizes that the

VE testified repeatedly and unambiguously that all of the duties of an estimator can

be performed while sitting or standing, and that the ALJ, having heard counsel's

challenges to this testimony during cross-examination, credited the VE's expertise

in finding at step four that Bush could return to the estimator position.

It appears, from the DOT listing for Estimator, that the VE is correct that sit/stand options are not included in DOT job descriptions.  *See* Estimator, DICOT 169.267-038 (4th ed. 1991), 1991 WL 647453.  Thus, the ALJ is reliant on the VE's testimony to establish whether a claimant with the hypothetical limitations provided could perform the position.  This was not improper.  "A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter,* 307 F.3d 377, 378 (6th Cir. 2001).  On the other hand, a VE "might offer testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar." *Biestek*, 139 S. Ct. at 1155–56.

Here, though Bush raised valid concerns of whether the estimator position could accommodate the sit/stand option as stated in the hypothetical, the VE's answers were neither feeble nor contradicted, and could be relied upon as substantial evidence by the ALJ.  Bush's argument "does nothing more than ask the Court to second-guess the VE's expertise."  *Lowery v. Comm'r of Soc. Sec.*, No. CV 17-12348, 2018 WL 3041201, at *6 (E.D. Mich. May 29, 2018), *report and recommendation adopted,* 2018 WL 3036320 (E.D. Mich. June 19, 2018).  That is not permitted on a substantial evidence review.  Further, at step four, the

24

burden of proof still lies with Bush to show that he cannot do past relevant work. *Preslar*, 14 F.3d at 1110. Bush has not sustained this burden; thus, the undersigned recommends that the ALJ's decision that Bush was not disabled during the relevant period be upheld.

<div align="center">VI.   Conclusion</div>

For the reasons set forth above, it is RECOMMENDED that the Commissioner's motion be GRANTED, Bush's motion be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

Dated: June 25, 2021                              s/Kimberly G. Altman
Detroit, Michigan                                 KIMBERLY G. ALTMAN
                                                  United States Magistrate Judge

<div align="center">**<u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>**</div>

The parties to this action may object to and seek review of this Report and Recommendation. Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

<div align="center">25</div>

party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 25, 2021.

<div style="margin-left:40%">

s/Marie E. Verlinde
MARIE E. VERLINDE
Case Manager

</div>